The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Douglas E. Berger, the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award. Accordingly, the Full Commission affirms and adopts the Opinion and Award of the Deputy Commissioner. Prior to the hearing, the parties entered into a Pre-Trial Agreement. This Pre-Trial Agreement is incorporated herein by reference.
 ***********
The Full Commission finds as fact and concludes as matters of law the following:
 STIPULATIONS
1. All stipulations contained in the Pre-Trial Agreement were received into evidence.
2. A blue index of medical records marked as stipulated exhibit 1 was received into evidence.
3. Vocational records marked as stipulated exhibit 2 were received into evidence.
4. Videotapes of the depositions of Terri Cochrane and Patrick Clifford were received into evidence.
 ***********
Based upon all of the competent evidence adduced from the record, the Full Commission adopts the findings of fact of the Deputy Commissioner as follows:
 FINDINGS OF FACT
1. At the time of the hearing, plaintiff was a thirty-eight year old male with an eleventh grade education. Plaintiff had worked approximately one month as a truck driver for the defendant-employer when he sustained his compensable injury by accident.
2. On October 23, 1990, plaintiff was performing his regular duties for the defendant-employer when he was engaged in placing tree branches and limbs into a piece of grinding equipment. A limb six inches in diameter became caught in the machinery and then sprang loose. During this process, the tree limb struck the plaintiff on the left side of his head and neck, impacting along the lower portion of his left mandible of his jaw. Plaintiff was then thrown against the hood of a truck by the impact. The parties entered into a Form 21 Agreement whereby the defendant-employer admitted that this incident caused plaintiff to sustain injuries to his left lower jaw and neck.
3. As a result of the October 23, 1990 compensable injury by accident, plaintiff sustained a cervical spine fracture at the C-2 region, soft tissue injuries to the left neck and shoulder area secondary to the same injury, a temperomandibular joint disorder and chronic pain syndrome.
4. As of June 30, 1994, plaintiff had reached maximum medical improvement with regard to his injury to his neck and his jaw. As a result of the October 23, 1990 compensable injury by accident, plaintiff sustained a five percent permanent partial disability to his neck.
5. From October 26, 1990 through at least July 15, 1991, plaintiff received medical treatment under the direction of neurosurgeon, Malcolm Shupek. Dr. Shupek directed plaintiff to undergo treatment that involved external mobilization with a halo. Plaintiff's pain symptoms continued to persist during his course of treatment with Dr. Shupek who eventually referred plaintiff to undergo pain management under the direction of Dr. Schulte.
6. Beginning on February 28, 1991, plaintiff came under the care of Dr. Schulte for psychotherapy and medication adjustment. Plaintiff was cooperative and compliant with the treatment recommendations provided by Dr. Schulte. EMG data accumulated under the direction of Dr. Schulte revealed that plaintiff was experiencing high anxiety and depression. Dr. Schulte has prescribed medications for the ongoing depressive symptoms that plaintiff has experienced.
7. A March 5, 1991 MMPI administered by Dr. Schulte revealed that plaintiff had considerable psychological difficulties. These difficulties had some characteristics consistent with post traumatic stress disorder.
8. Dr. Schulte restricted the plaintiff from returning to work up until March 22, 1994. As early as late August, 1991, Dr. Schulte began to discuss plans with the plaintiff for a return to some form of employment. Plaintiff started experiencing marked anxiety levels that Dr. Schulte opined were related in part to plaintiff's fear in returning to work.
9. During the course of his treatment with Dr. Schulte, plaintiff received medical treatment from Dr. William Godwin, a dentist, who provided treatment for plaintiff's temporal mandibular joint dysfunction.
10. On December 27, 1993, rehabilitation nurse, Laura Littrean with Armstrong and Associates, began coordinating plaintiff's medical treatment. Ms. Littrean maintained contact with each of the physicians who were providing ongoing treatment to the plaintiff.
11. On March 22, 1994, Dr. Schulte reported to Ms. Littrean that plaintiff had reached maximum medical improvement and that plaintiff would benefit from vocational rehabilitation. Dr. Schulte warned Ms. Littrean that while plaintiff appeared to be motivated to return to work, he did have periods of regression where the plaintiff did experience somatic symptoms. Dr. Schulte agreed to assist the rehabilitation consultant in an effort to progress the plaintiff towards employment.
12. On April 18, 1994, Ms. Littrean directed plaintiff to see Dr. Rice, an orthopedic surgeon, for an independent medical evaluation. Based upon a functional capacity evaluation of plaintiff's physical abilities, Dr. Rice rendered an opinion that plaintiff could return to work within the following restrictions: plaintiff could not lift more than thirty pounds. Plaintiff could not sit or stand for periods longer than thirty minutes. Plaintiff could return to work starting at four hours a day and then eventually increasing to eight hours a day.
13. On June 1, 1994, the defendant-employer reported to Ms. Littrean that it did not have a job for the plaintiff within the restrictions set forth by Dr. Rice after reviewing the results of the functional capacity evaluation.
14. On June 28, 1994, Ms. Littrean reported to Dr. Schulte that vocational rehabilitation efforts would begin in the case. Dr. Schulte was in agreement with the graduated return to work approach recommended by Dr. Rice. Dr. Schulte specifically directed Ms Littrean to inform the vocational consultant that would be assigned to this case to maintain contact with him providing a vocational update as well as discuss any problems that she might be having with the plaintiff. On July 1, 1994, Ms. Littrean transferred this case to vocational specialist, Vickie Cochrane. At the time that Ms. Littrean discontinued her services, she had successfully helped to motivate the plaintiff to attempt to return to work.
15. From July 25, 1994 to December 6, 1994, plaintiff received vocational rehabilitation services under the direction of Terri Cochrane. On August 5, 1994, plaintiff reported to Ms. Cochrane that his treating psychiatrist, Dr. Schulte, had only approved a release to return to part-time work. Ms. Cochrane's vocational notes do not show any attempt by her to consult with Dr. Schulte with regard to this restriction. Instead, she spoke to Dr. Rice's secretary who then reported to Ms. Cochrane that Dr. Rice knew of no medical reason why plaintiff should only seek part-time work. Dr. Rice never explained why he reversed his earlier position that plaintiff should return to work on a graduated basis. (At the time Dr. Rice made his earlier recommendation, the defendant-employer had not rendered its decision that it would not allow the plaintiff to return to work on a graduated or full time basis.)
16. Ms. Cochrane's vocational notes suggest that she never consulted with Dr. Schulte about any of the problems that arose between her and the plaintiff. Despite knowing that Dr. Schulte was treating the plaintiff for ongoing depression, there is no evidence that Ms. Cochrane ever consulted Dr. Schulte about plaintiff's depression. Despite plaintiff's history of symptoms characteristic of post traumatic stress disorder, there is no evidence that Ms. Cochrane ever consulted with Dr. Schulte over her decision to pressure plaintiff to immediately look for full-time employment.
17. Terri Cochrane did not conduct a specific labor market survey of the Moore County area that took into account plaintiff's transferable skills and/or his physical limitations.
18. Plaintiff demonstrated to Ms Cochrane that he knew how to fill out a job application appropriately.
19. Plaintiff submitted applications and resumes on an inconsistent basis to prospective employers.
20. Between the months of August and September of 1994, Ms. Cochrane directed plaintiff to seek to obtain a delivery driver position that was available with an area florist. Plaintiff showed up to complete an application without having shaved or combed his hair. He wore shorts and a torn shirt that was not tucked in at the time that he completed the application. The prospective employer's personal observation of the plaintiff's appearance led him to decline considering the plaintiff for a job position. Plaintiff did not show up dressed in this manner for an interview. After Ms. Cochrane informed plaintiff that he needed to present himself in a professional manner during all contacts with a prospective employer, no further incidents reportedly took place.
21. Between the months of August and September of 1994, plaintiff reported that he had filed ten applications with prospective employers. Ms. Cochrane determined that one of these ten employers had claimed that plaintiff had not submitted an application as he had reported.
22. On many of the job applications completed by plaintiff, there was a question concerning why plaintiff left his prior employment. Plaintiff would answer this question by reporting that he broke his neck. Despite Ms. Cochrane's advice that plaintiff defer answering the question in detail until plaintiff was granted an interview, plaintiff insisted on answering the question with a detailed description of his injury.
23. Plaintiff only obtained two job interviews during the entire time period that Ms. Cochrane assisted him in attempting to locate employment.
24. On September 20, 1994, plaintiff made a diligent, but unsuccessful effort to obtain a desk clerk job with Mid Pines Resort. This job could be performed by alternating between sitting and standing.
25. Plaintiff set up an appointment for an interview with Ithaca Industries to discuss a panty hose position on October 5, 1995. Plaintiff rescheduled this appointment to October 10, 1995 because of car trouble. Plaintiff did not show up for the appointment on October 10, 1995. Plaintiff did call the prospective employer and attempt to reschedule the appointment. Ms. Cochrane's testimony concerning the job requirements of the panty hose inspector was contradictory. At one point on direct examination, Ms. Cochrane testified that the job required constant standing. On cross-examination, she testified that plaintiff could do the job sitting or standing. Futhermore, there is no evidence that plaintiff could have started this job on a four hour a day basis as agreed to by Dr. Schulte.
26. Ms. Cochrane has a master's degree in rehabilitation psychology from Appalachian State University. When queried on cross-examination as to whether or not plaintiff could do everything on the rehabilitation agreement "to a T" given plaintiff's depression, Ms. Cochrane indicated that she did not know because she was not a psychologist. Plaintiff repeatedly informed Ms. Cochrane that he was depressed. Despite knowing the plaintiff had mental problems, she made no attempt to include his psychiatrist in the vocational rehabilitation process. On December 6, 1994, Ms. Cochrane recommended that vocational rehabilitation efforts be discontinued. Ms. Cochrane opined that plaintiff was not sincere in his willingness to participate in efforts to obtain suitable employment. Because Ms. Cochrane did not consult with Dr. Schulte on an ongoing basis as he directed, the undersigned gives little weight to Ms. Cochrane's opinion.
27. On December 30, 1994, the defendant-carrier filed a form 24 application seeking the authority to terminate and/or suspend plaintiff's benefits. On February 1, 1995, then Special Deputy Commissioner Bain Jones disapproved this Form 24 application. He did order the plaintiff to cooperate with the vocational rehabilitation plan that plaintiff had signed during August 1994.
28. On March 9, 1995, Patrick Clifford, another vocational rehabilitation specialist, met with the plaintiff in an effort to restart efforts to locate employment for the plaintiff. Plaintiff refused to cooperate at all with Mr. Clifford as directed by Special Deputy Commissioner Bain Jones. Like Ms. Cochrane, Mr. Clifford did not consult with Dr. Shulte prior to his attempt to assist the plaintiff in locating employment. Like Ms. Cochrane, Mr. Clifford did not limit plaintiff's job search to part-time employment.
29. There is insufficient evidence to support a finding that the jobs identified by Ms. Cochrane and Mr. Clifford were suitable to plaintiff's capacity taking in account both his broken neck and his ongoing depression.
30. There is insufficient evidence of record to support a finding that plaintiff's ongoing depression would not impair plaintiff's ability to cooperate with Ms. Cochrane and Mr. Clifford.
31. On April 25, 1995, the defendant-carrier filed a second form 24 application. On May 31, 1995, Special Deputy Commissioner Bain Jones issued an order authorizing the defendant-carrier to terminate ongoing temporary total disability benefits to the plaintiff beginning March 9, 1995.
 ***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff's refusal to cooperate consistently with both Ms. Cochrane and Mr. Clifford was justified in the opinion of the undersigned. The defendants have failed to show by the greater weight of the evidence that plaintiff's ongoing depression did not prevent him from consistently cooperating with vocational rehabilitation efforts. Furthermore, the vocational consultants did not limit their job searches to part-time work with a graduated return to full-time work as required by his treating physician, Dr. Schulte. Neither Ms. Cochrane nor Mr. Clifford consulted with Dr. Schulte as he had required as a condition of his release of the plaintiff to participate in vocational rehabilitation efforts. N.C. Gen. Stat. § 97-32; McLean v. EatonCorporation, 125 N.C. App. 391, 481 S.E.2d 289 (1997).
2. Plaintiff is entitled to receive temporary total disability compensation in the amount of $166.67 per week for the time period beginning March 9, 1995 through the filing date of this decision, and until further order of the Industrial Commission. N.C. Gen. St at. § 97-29.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Former Special Deputy Commissioner Bain Jones' May 31, 1994 Administrative Decision and Order authorizing a termination of plaintiff's temporary total disability benefits is HEREBY SET ASIDE.
2. Defendants shall pay to the plaintiff temporary total disability compensation in the amount of $166.67 per week for the time period beginning March 9, 1995 through the filing date of this decision and until further order of the Industrial Commission. The portion of this amount that has accrued shall be paid in a lump sum subject to the attorney's fee approved below.
3. Dr. Schulte is HEREBY APPROVED as plaintiff's treating physician.
4. Defendants shall reinstate vocational rehabilitation efforts to the plaintiff. The vocational consultant shall consult with Dr. Schulte on an ongoing basis. Defendants shall assist in attempting to locate employment within the restrictions as set forth in forth in finding of fact number 12 unless Dr. Schulte agrees to a modification.
5. Plaintiff shall cooperate with vocational rehabilitation efforts by the defendants in the following manner: plaintiff shall respond to any question on a job application as to the circumstances under which he left his prior job as follows: "I will discuss this topic during any interview." Plaintiff shall provide his own transportation when engaging in his search for employment.
6. A reasonable attorney's fee of twenty-five percent of the compensation due plaintiff under paragraph 2 of this Award is approved for plaintiff's counsel and shall be paid as follows: twenty-five percent of the lump sum due plaintiff shall be deducted from that sum and paid directly to plaintiff's counsel Mr. Smith and his two prior attorneys, Mr. Burke and Mr. Wickham. Thereafter, every fourth check shall be paid directly to plaintiff's counsel, Mr. Smith and his two prior attorneys, Mr. Burke and Mr. Wickham. If' Mr. Smith, Mr. Burke, and Mr. Wickham can not agree as to what portion of this Award should be allocated for their services, then the defendant-carrier shall place the attorney's fees in a trust pending further order from the Industrial Commission or a court with jurisdiction to settle the fee dispute that has arisen.
7. Defendants shall pay expert witness fees in the amount of $80.00 to Patrick Clifford and $160.00 to Terri Cochrane.
8. Defendants shall pay the costs.
This 9th day of June 1998.
 S/ _____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ _________________ CHRISTOPHER SCOTT COMMISSIONER
S/ _________________ DIANNE C. SELLERS COMMISSIONER